Good morning, ladies. Thank you for appearing in this unusual way. One thing I was going to ask you to do was to mute your cell phones. And the second is that you can help us out by giving us record citations when possible. We're a little more flexible on our time limits in order to make sure that we get all the arguments out properly. The other thing I would mention is we do not allow video or audio recordings, the same as we wouldn't if we were in New Orleans. And we will give you each your first five minutes of argument uninterrupted. With that, we will call case number 19-30896, Schaefer v. St. Bernard Parish, and we'll hear from Ms. O'Boyle first. Thank you. Good morning, Your Honors. May I please report? My client, Sharon Schaefer, was detained, raped, and brutalized by her employer, who was also the parish president. That very same day, she reported this crime to both the St. Bernard Parish Police and Louisiana State Police. This incident, however, taken in isolation, is not why we're here today. We're here today because the next day, when my client returned to work, she was accosted by her employers, which is Mr. Peralta's personal attorney, and forced to go with him to Mr. Peralta's office. While at the office, her employer threatened her with adverse employment action, and she refused to drop the charges against him. This incident happened, and I just want to be absolutely clear, on October 17, 2013. On December 4, 2013, my client complained to her immediate supervisor, who was Mr. Magoli, about Mr. Peralta's persistent harassment and discrimination. In response to this complaint, she was summoned to Mr. Peralta's office and harassed for making this complaint to her immediate supervisor. The next day, my client went to her immediate supervisor, Mr. Magoli, and explained that the parish president, Mr. Peralta, the accused rapist in this situation, was forcing her to take a leave of absence. Mr. Magoli presented her with the same option of having to take a leave of absence that was given by Mr. Peralta. On December 23, she filed a formal EEOC complaint. These facts are relevant because, of course, when granting a summary judgment, you must take all the evidence and facts in the light most favorable to the plaintiff. And in this case, an adverse employment action, she was forced to take a leave of absence, which eventually resulted in a constructive dismissal. As a result of her reporting her rape and detainment to the authorities. I also want to go over a few points regarding whether or not Mr. Peralta, who earlier in their relationship was her immediate supervisor, was still her supervisor when the incident happened. When the incident happened, Mr. Peralta was parish president. And although he had since, you know, they had had done a. I'm sorry. And although they had done a. There was a. An agreement that he would no longer serve as her immediate supervisor. There have been actions taken after that agreement was made to show that this was not that this was just a formality and was not actually taking place in person. Mr. Peralta, you know, to that point, Mr. Peralta had exercised his supervisory. Capacity over Ms. Schaefer when she reported to FEMA actions taken by a friend of his regarding gambling and within a FEMA property. This was presented to the court, the lower court. In an email exchange. In this situation, Ms. Schaefer. Was suspended after she made this report. Her immediate supervisor decided that the suspension was not was not proper and took actions to reinstate her pay for the three days suspension that she was she received as a result of making this report. However, that reinstatement three statement was blocked by Mr. Peralta. This is important because it shows that Mr. Peralta was exercising supervisory authority over Ms. Peralta even after. The. The statement was made that he would no longer do do that. Finally, I want to go over. The case that was cited by Apelli regarding and the one that actually was. Was relied upon by the lower courts. And I'm sorry, my computer is cracked. My. Euler Euler. I don't know if I'm pronouncing correctly. In the case that was relied upon by the lower courts to. To say that the parish is entitled to an affirmative defense. While the parish is entitled to an affirmative defense. Apelli said not the the the parish did not prove the applicability of this affirmative defense in this case. The policy states that a supervisor has an obligation to report sexual harassment as well. It has been proven through testimony. And let me ask you. What is the specific harassment that you are complaining about here? By whom? When did it occur? And what was it? Okay. Once my client returned to work, she was harassed by Mr. Peralta himself and Mr. Magui as well. Her direct supervisor. When she returned, she returned to work from where? The day after her suspension. Is that what you're talking about? No, your honor. The day after her rape, she returned to work. Okay. She reported that rape to the police. And when she got to work, she was forced to go to her rapist's office and then forced to go to the police department to withdraw that complaint. And this was done on the threat of adverse employment reaction action. So the day after she was raped, she was forced to go to her employer's office and she was then taken to the police department in a parish vehicle. Okay. Now, what is your argument that this is harassment that is chargeable to the, what is your argument that it is basically harassment protected by Title VII? It's a sexual harassment. Okay. She made a sexual harassment claim against an employer and that outside of the employment arena. She was not raped in the course of her employment, correct? No, not at all. But when she came to her employment, when she came back to work, she was harassed by her employer, who was also her rapist, to do certain things, to not report the sexual harassment. She also reported that harassment to her direct supervisor. What harassment are you talking about now? Well, the assault. The assault. When she was assaulted, she went to her direct supervisor and she reported that assault. But the assault, but you just said the assault did not take place in terms of her employment conditions or employment environment. So it is not, I mean, that is not protected under Title VII of the Civil Rights Act as I understand what you have conceded. But when she goes back to work, when she has had adverse employment actions taken as a result of reporting sexual harassment, whether or not it's taken by an employer, by another employer, by the employer, whether or not it took place on employment property, during employment hours, her employment is now being affected for reporting an instance of sexual assault. Additionally, filing a police report is a protected action. And she filed a police report in this case. And that was, again, one of the actions that she was being... I thought she filed a police report in connection with her personal life or in connection with her employment life? She filed a police report in connection with the fact that her employer raped her. Okay. And that the employer, let's take it out of her, it was her husband, but we're still talking about her employer, someone who works at her office with her. And so once she goes back to work, the fact that this is still following her at work, that's harassment. That's a hostile work environment. When she came back to work, they didn't all act like nothing happened. They actually went to her and forced her to recant. As a parish president, he's in a very unique position. The parish police work for him. Everyone in the building that she is in works for him. And they all were taking action to force her to recant her story, which she did not do, but to withdraw her police report as well. Who was that that did that? Who are you saying actually forced her to withdraw her police report? Mr. Peralta, the parish president. And her husband? Yes, and the rapist. All right. Her rapist husband? Yes, yes. I don't think that is a consequence that her husband is the person who raped her in this instance, because he was also her employer. I mean, you'll forgive me, but I quite misunderstood the basis for the plausibility of the harassment claim. Because Mr. McGaughy noted that your client had gone on a vacation at Disney World shortly after this alleged rape. And so he concluded, quote, whatever issues had occurred between the couple on October 27, 2013 have been resolved. And that was factual inaccuracy. My client was forced to go on this trip, which lasted a day. They did not do it together in order for her parents to stay. Again, we're talking about the parish president. And the media was involved. It was a huge deal. He forced her to walk out of the building the next day with him, hand in hand. I understand that part. Where is the evidence that your client was forced to go to Disney World? Her testimony. I think her testimony serves as evidence. And she testified that that was not something she wanted to do. Well, but if she didn't want to do it and her immediate supervisor was misled about the circumstances, everything then hinges on her husband being the supervisor, does it not? Yes, and he is the supervisor. He acted in a supervised capacity over her on numerous occasions, once being documented in the email communications regarding the FEMA reporting of the gambling incident. And was he operating in his supervisory capacity when he raped her? I'm not sure. I don't know. And again, that was done outside of the employment capacity. But when he forced her to come to his office and when he threatened employment action, he threatened her to be forced to take leave and constructively fired her over all actions taken in his supervisory capacity. What about the other problem? You've got to show causation because I think at some level your claim is that your client was wrongfully terminated, right? Right, Your Honor. Well, what about the fact that two people witnessed her saying that she was suicidal and she was going to get a gun? Your Honor, I think, again, this is a factual issue and my client testified and I think it is actually telling the way that the report is written that what she did, exasperated and upset because of the injustice of it all. She walked into an office and said, what do you guys want me to do, kill myself? You know, get a gun in court? Is that the exact testimony in the deposition or what? I believe that's almost word for word what she said. What do you guys want me to do, get a gun and kill myself? And that's exactly the way she said it. And again, you know, this was mentioned that she mentioned a gun on parish property. We're in Jefferson Parish in Louisiana. Guns are mentioned on parish property all the time. This was the same she said out of aspiration and desperation of the injustice of having been exposed to everything she was exposed to and still being threatened with employment action. You said she was retaliated against by being discharged. Is that correct? I think it was a constructive dismissal when they forced her to take administrative leave when she refused to recant the rape. All right. And then when when was she discharged? At the time they forced her to take the leave. I believe that was a constructive discharge. And then they sent a letter at a later point in date discharging her. But there was a point where she did not feel that she was able to return to work once they forced her to take the leave. Well, but I assume I assume from the fact that she was formally terminated after the leave expired several months of leave. And they said it's time to come back to work now. And she didn't she never came back. But during the leave, how much of that was she compensated for as if she were still on the payroll? I am not sure, Your Honor. She was paid for some of it. She was definitely paid for some of it. I do. I do know that. Okay. And these are facts, again, material facts are an issue in this case. In your view, what is the biggest mistake that the district judge made in his ruling? Finding that Mr. Peralta did not act in a supervisory position over my client. I think there was proof that he had done in the past and that he had done it in this instance as well. That is the biggest issue. Also, I think that the case, I think it's Eldridge, was misapplied. I think that because just because there's an affirmative defense doesn't automatically mean that the case that my client's case does not have merit. I think that they have to prove the applicability of this affirmative defense. And they did not do that. Especially when the supervisors, once they have knowledge, are also under a duty under this particular policy to do something. And they didn't do anything. She reported this to her supervisors. She reported to the EEOC. She reported to the police department, the state police. I think my client did everything that she could think of to try to get justice in this situation and to retain her employment. All right. We have your argument and you have a chance for rebuttal in a little bit. And we'll hear from Ms. Fishman. I may please the court, Your Honors. Deborah Fishman on behalf of the Appley, the St. Bernard Parish government that we'll probably refer to as only St. Bernard or the parish. We appreciate the privilege to argue before you. And before we go into basically our scripted argument, we would like to respond to a few questions that were raised. And I believe it was Judge Jones. Ms. Schaefer was on paid leave from December 5th, which was the day following the gun, we'll call it the gun incident, until January 1st, 2014. And the parish actually had an employee donate some time so that Ms. Schaefer could take leave for almost one month. And it was paid leave. And I realize I'm getting ahead here of our argument. But what is very telling, and it's record on appeal, I believe it's 929. There was an email that Ms. Schaefer sent to Billy McGowey, who was her boss, who was a supervisor. He's an attorney in the legal department. In fact, it was really, at that point, a one-man legal department. Ms. Schaefer was the paralegal saying, and this is January 1st, 2014, I have post-traumatic stress disorder and I want to take FEMLA leave. So at that point, next day, January 2nd, Ms. Schaefer is on Family Medical Leave Act leave until April 2nd. And when she didn't return to work following her FEMLA leave, that's when she is terminated. So we just wanted to clear that up. What about the argument that she was forced to take FEMLA leave by her husband in one instance and by her employer in the second instance? Your Honor, there's no record evidence that she was forced to take leave other than her own self-serving testimony. And what flies in the face of that argument is her email to her boss, Billy McGowey, that says, I want to take FEMLA leave. She's not saying, I can't come to work forever. She's not saying, I'm resigning. She's taking FEMLA leave. So she's an employee, she availed herself of the Family Medical Leave Act, and then she decides not to come back to work. That's not a constructive discharge. And I'll tell you one other reason why it isn't, Judge. The alleged rape in the marital home that was perpetrated by Ms. Schaefer's then-husband took place on October 28, 2013. She shows up for work the next day, which is Monday, and she continues to work until the gun incident on December 4th or 5th. So she continued to work for, what, five weeks after the alleged rape? So if the conditions were so intolerable that she couldn't work... Did she still live with her husband during that period of time? She did, sir. She did. She continued to live at the family home in Monroe, Louisiana. And it's all in the record. It's in Mr. McGoughy's affidavit that Ms. Schaefer's seen leaving the St. Bernard Parish governmental complex hand-in-hand with her husband, Mr. Peralta. They then go to Disney World, and it's in the record. It's in Mr. McGoughy's deposition. So those facts certainly cut into any argument that Ms. Schaefer had to take a constructive discharge. And also, Ms. Schaefer's counsel made one remark that this is Jefferson Parish and everyone has guns. No, this event is St. Bernard Parish. This involves the St. Bernard Parish government. Mr. and Mrs. Peralta lived in Monroe, which is in St. Bernard Parish. So we just wanted to clear up those few misstatements. And the other thing is, Ms. Schaefer reported the rape not to the St. Bernard Parish government, but she reported the alleged rape perpetrated on her by her husband in the family home. She went to the St. Bernard Parish Sheriff's Office, which is not part of the St. Bernard Parish government. And Mr. Peralta is the then Parish president, has no control over the Sheriff's Office. And then she went to the state police. So that is not part of the St. Bernard Parish government, and we just wanted to clear that up. Now, a brief history, and I'll try to be brief here. 2007, Ms. Schaefer's hired by the St. Bernard Parish government as an at-will, non-civil-service-protected employee. And her job position was as a paralegal. In, I want to say it's November 11, 2011, Mr. Peralta's elected parish president. He had been the chief administrative officer. He takes office January of 2012. He and Ms. Peralta marry March 31, 2012. Mr. Peralta sends a letter to Dr. Jerry Graves, who was then the chief administrative officer for the parish, saying, I'm married to Ms. Peralta. I can't supervise her. You need to supervise her. I'm washing my hands of supervising her. And that letter, it's in the record. I believe it's 931, is the citation to the record. Well, Ms. Fishman, that doesn't prove anything as a matter of law. And, Your Honor, we'll get to evidence, record evidence, Your Honor, that shows that Mr. Peralta was not supervising Ms. Schaefer. Ms. Schaefer did file suit. She filed a suit in the state court that she let abandon. She had a contemporaneously filed suit in the Eastern District, where she originally asserted 19 separate claims of causes of action against 11 defendants. And in December of 2017, Judge Vance, who had the case at the time on the Eastern District, dismissed all claims against all defendants, except Ms. Schaefer's two Title VII claims, one for retaliation and one for a hostile work environment, and only kept the parish government as a defendant. Now, I would like, and then on, in August of this past year, August 29th, the St. Bernard Parish government moved for summary judgment, and the district court, through the Honorable Judge Barry Ash, granted the St. Bernard Parish government's summary judgment, and there was judgment entered on October 21, 2019. Let's now talk about Ms. Schaefer's retaliation claim. She seems to argue that there were two instances of retaliation. One was when she reported alleged illegal gambling, and the other is when she reported the alleged rape perpetrated on her by her husband in the family home. Let's talk now about the gambling situation. Judge Vance found, in her December 2017 Ordin and Reasons, that gambling is not a protected activity under Title VII. Therefore, if you report gambling, that's not a protected activity. And when Ms. Schaefer reported the gambling around October 13 of 2013, the matter was investigated, but the gambling was a football pool in the St. Bernard Parish government's FEMA office. And the reason Ms. Schaefer was suspended was not because she reported the gambling, but because she lied about it. She disavowed having gone into the FEMA office and surreptitiously taken photographs of, I believe it was a dry erase board that showed the football pool. Parenthetically, what upset her so much about this that she broke into his office running a football pool? If I can answer that, the person who was running the pool was a guy named Donnie Bourgeois, and Ms. Schaefer couldn't stand Donnie Bourgeois. He was a political person in the parish who helped run her husband's campaign. You saw that mess down there, didn't you? I feel like these details are somewhat sorted, but anyway. Look, I can go into, but I'll spare you all the deposition testimony about the torture room and the chains and hooks from the ceiling of their bedroom. But anyway, that was the situation with the gambling event. Ms. Schaefer finally was, if you will, busted about it when there was surveillance video showing her taking the pictures that she denied taking. All right, so she's suspended. And that whole situation really is of no moment because Ms. Schaefer never appealed Judge Vance's ruling saying the gambling is not protected activity. So let's now go a couple of weeks later to the alleged rape in the family home, which took place on October 28, 2013. Ms. Schaefer reports it to the state police, not the parish government. She shows up at work the next day. She seemed leaving the building, holding hands and smiling with her then-husband. But what's important here is to do the Title VII analysis. That Ms. Schaefer was engaged in protected activity, which would be reporting a rape. And that adverse employment action resulted from her report. And there's a temporal connection between the adverse employment action and her protected activity. And here we're saying that Ms. Schaefer didn't even make out a prima facie case because she didn't show the temporal connection. Ms. Schaefer continued her employment with the parish until she's terminated April 2nd for not returning to work following her family leave. And therefore, there's no temporal connection. The United States Supreme Court, in the Clark County v. Breeden case, basically says four months is too long. They cite it with approval. Another case, it's Hughes v. Derwinski that says even three months may be too long. So if three or four months is too long for a temporal connection, certainly five months is too long. And we've already mentioned the email that Ms. Schaefer sent to her boss, Billy McGoey, saying, I want to take FEMA leave. And she already told your honors that she was on paid leave until January 1st. And she sends an email signed by Jaron Schaefer, paralegal, St. Bernard Parish Government. So clearly she's working. And one must be employed to receive FEMA leave. So it's most disingenuous to say that Ms. Schaefer was not employed until she failed to return to work five months in almost a week following the report of the alleged rape. But even if we say that Ms. Schaefer made a prima facie case under the McDonnell-Douglas burden-shifting analysis, she cannot show that the proffered reason that the St. Bernard Parish Government gave for her termination, which was non-discriminatory, which is her failure to return following FEMA leave, and not returning to work after the expiration of FEMA, is grounds for termination. We cite Powers v. Sanderson Farms, which is a case from this circuit from October 2013. So once we offer or proffer a non-discriminatory reason for her adverse employment action, it's up to Ms. Schaefer under the U.S. Supreme Court's decision of Nassar to show that our proffered reason was nothing that's false, it lacks credibility, but she has to show that but for her report of the rape, she would not have been terminated. And Your Honors, we respectfully submit that not only has Ms. Schaefer not established a prima facie case, but when we go to the McDonnell-Douglas burden-shifting, she hasn't proven that but for her report of the rape, she would still be working at St. Bernard Parish. And we also cite in our papers that Ms. Schaefer, according to her deposition testimony, has never returned to work. So how can she say reporting that but for her having reported the sisterhood, she would still be employed? Ms. Schaefer's subjective belief as to why she was terminated is not a consideration. We cite the DeVere case to this court in support of that. We also cite Lawson v. Southern Components, which is a Fifth Circuit case from 2011, that says Ms. Schaefer cannot rely on her subjective relief. So once again, simply put, Ms. Schaefer flunks the test, the but for test under Nassar. Therefore, this court should affirm the correct decision of the lower court that found that she did not sustain her burden of proof, showing that the St. Bernard Parish government retaliated against her for reporting a rape that took place as even Ms. Schaefer's counsel concedes in the privacy of the family home. Now let's talk for a moment about the work environment claim. And counsel for Ms. Schaefer brings up the Ellerth case. And the United States Supreme Court in January of 1998 decided that Ellerth, the Burlington Industries case, along with Farragher v. City of Boca Raton. And both of those cases set, really it was groundbreaking law when it came out, concerning hostile work environment. And under those two Supreme Court cases, the Parish of St. Bernard is entitled to assert as an affirmative defense that they had a policy in place to prevent unlawful sexual harassment or sexual discrimination. And under that policy, Ms. Schaefer had a duty to report the sexual harassment. And here, not only did Ms. Schaefer not report the harassment, her own counsel, with all due respect, can't even point to this court what the actual harassment is or was at the time that she should have reported it. And there is no dispute in the record that Ms. Schaefer was aware of the St. Bernard Parish's anti-harassment policy because she signed for it. And that is in the record, I believe it's at 1362 to 1365. Yes, sir. The counsel opposite says that the harassment involved her reporting the rape and the confrontation that she had when she did report it being manhandled and harassed about the fact that she would not withdraw it and so on. As I understood, that is the harassment that she is focusing on and maybe it's all of the harassment she's alleging. Excuse me, I don't mean to cut you short, Your Honor. We can speak to that. First of all, that harassment supposedly involved her... Let me ask you, and what I'm asking you is this. Do you understand that to be her claim? What do you understand to be the basis of her claim of sexual harassment? First of all, I appreciate your honors, what you just brought up. But that is not harassment. That is not severe and pervasive harassment under case law and under Title VII. The second question that I was asking you, what do you understand? You have tried this case. You've been involved in it. You've heard all sides of it. What do you focus on now as the nucleus of her claim of sexual harassment? Your Honor, Ms. Schaffer really hasn't set forth the specifics of a harassment claim. Typically in these cases, and we're all familiar with them. They've been around a while and the Fifth Circuit has had a rather active docket with these cases. Harassment is typically a boorish employee or supervisor constantly saying to, say, a person of the opposite sex. Typically it was a male allegedly harassing a female employee saying, Oh, you look pretty today. You want to go have dinner? Oh, I like how you look. That's typically the type of behavior you get. There's none of that here. And what I suppose complicates it is Ms. Schaffer voluntarily married Mr. Peralta. She chose to live with him. She chose to be married to the parish president. And she chose to have, for lack of a better word, a somewhat crazy sex life with him in the privacy of their own home. And the fact that she says that, Oh, Mr. Peralta maybe dug his fingers into my shoulder when I was in his office. That is not harassment. And he had his personal attorney, a gentleman by the name of Pat Fanning, who was not employed by the parish in his office at the same time. Well, that's no behavior that can be imputed to the parish government. That is purely personal behavior. So the harassment here is pretty nebulous, to say the least. But regardless, Ms. Schaffer, and this is in her deposition testimony. It's 1368 to 81, 1385, 1309. She didn't report that harassment to Mr. McGoughy. She claims she did. No, what happened was she told Mr. McGoughy that her husband said either take leave or you're going to lose your job. Mr. McGoughy, and he gave very impassioned deposition testimony that we cite in our brief, and we also have record citations to his testimony, was most disturbed by the fact that Ms. Schaffer, in front of two witnesses, said, I need a gun. I want to kill myself. That's why she was placed on leave. It had nothing to do with what she reported to Mr. McGoughy, what her husband told her. I mean, what's a responsible boss supposed to do when an employee says that? Not take action? Okay, I'm going to ignore it. And that employee may be so unhinged that the next day she shows up at work with a gun and kills herself or kills innocent bystanders. That was the precipitating factor that led to her taking paid leave of absence for a little over a month. Ms. Fishman. Yes, ma'am. Well, you're out of time is one thing.  I do have a question. How can it? Are you familiar with any cases that have found actionable claim of hostile environment where an employee goes on paid leave for one week, followed by or FMLA leave? We did not cite, and so we must not have found that case. I'm not saying, I'm asking. We did not find one, Your Honor. I mean, that has to be classified as an adverse employment action, and it's hard for me to see how it is, but. I didn't mean to interrupt you, but the other thing is. Answer the question. Your time is up. Oh, I'm so sorry. I would just thank Your Honors, and we would just ask that this honorable court affirm the correct ruling of the lower court. Thank you so much. Okay, thank you. All right, Mr. Boyle, one rebuttal. Yes, thank you, Your Honors. I think that almost this entire discussion proves that there is a factual dispute. There's a factual dispute regarding her constructive discharge, her testimony, and the facts surrounding her discharge, which we're saying. When the parish says that the temporal connection is too long, our argument is that she was constructively discharged when she was forced to take a leave. And so the temporal argument isn't applicable in that situation. Again, and that's a factual dispute. I thought you also said that after she took the leave that she continued to be paid for a while, or did I misunderstand you? That is true. That is true, but I don't think that that's true. How can she claim she was discharged if she's still on the payroll? And that's why I say constructively discharged. How are you constructively discharged if you're still putting money in your pockets for the work you're doing? My understanding is a constructive discharge is when, in a sexual harassment situation, you feel that you're unable to return to work because of the situation, the hostile work environment. Even on a constructive discharge, there has to be a discharge of some kind. There has to be a termination of the employment, I would think. And I believe that the termination of her employment situation, she was no longer able to return to work. She was still being paid. It's like if you were fired or received a severance, that doesn't mean you weren't fired. It doesn't mean you weren't discharged. And so at that point, she did not feel that she could return to work. That is, again, a factual dispute that she feels, and I think the circumstances surrounding it and her testimony support that. All right, but what do you say about the causal connection question? Which is to say, the but-for causation, because her termination happened five or six months after the alleged retaliation, number one. Number two, she refused to come back to work. So when she refused to come back to work, the company, the Paris said she was fired. I think that goes back to what I was just previously arguing. The but-for is, but for her being forced to take leave, this would not have happened. She would not have been fired. She would have continued on to work as she had previously. So you're contending that the FMLA leave, which she requested, was forced on her? I am not saying that it was forced on her. At that point in time, she did not feel that she could return to work. She was constructively discharged.  And so she did want to get paid for as long as possible. Well, FMLA leave is unpaid leave. I understand.  Okay. And exactly what was the retaliation was that she was forced to withdraw the complaint she had made about what you might call an off-campus assault. Is that the essence of the retaliation claim? That is a large part of it. And the retaliation was also that when she returned to work, she still was forced to, on numerous occasions, go to his office. And when he was not her direct supervisor, when it was well known that she had a claim against him, a claim that she filed with the EEOC for it to be said that she did not report this. She made a claim with the EEOC, which her immediate supervisors received a copy of in December of that same year. And so the idea that she didn't report it, she reported to Mr. McGaughy right after the incident where she was being forced to pretty much resign, to take this leave. She reported that to Mr. McGaughy, and that's her immediate supervisor, and he pretty much seconded what Mr. Peralta was forcing her to do. I think that, again, there is a factual dispute, and we ask that this honorable court overturn or overrule the lower court's ruling. Okay, we have your argument. Thank you very much. And this concludes the arguments for the day. The court will stand in recess until 9 o'clock tomorrow morning. Thank you.